IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS –
HOUSTON DIVISION

| | | |
|---|---|---|
| TOBY JAMES, | § | |
| | § | |
| Plaintiff, | § | CA: 4:11-cv-1183 |
| v. | § | |
| | § | |
| CONCEPTUS, INC., | § | |
| | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

# PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Toby James, and complains of Defendant Conceptus, Inc., and for his cause of action would show the Court as follows:

## I.
## INTRODUCTION

vi.     This is a whistleblower retaliation action arising under the False Claims Act, 31 U.S.C. § 3730(h) ("the Act"), which encourages employees with knowledge of fraud to come forward by prohibiting retaliation against employees who assist in or bring "qui tam" actions against their employers. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir.1994).

2.     Section 3730(h), as applicable to this suit, protects "lawful acts done by [an] employee ... in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." § 3730(h).

3. James will show that he engaged in activity protected under the statute, that his employer knew he engaged in protected activity, and that he was discharged because of it.  *Id*; *Robertson*, 32 F.3d at 951.  James characterized his concerns as involving illegal, unlawful, or false-claims investigations.

4. Plaintiff demands a jury on all issues triable to a jury.

## II.
## PARTIES

5. Plaintiff Toby James is a resident of Houston, Texas.

6. Defendant Conceptus, Inc. is a Delaware corporation which, contrary to its practices, is not listed with the Texas Secretary of State as a company licensed to do business in Texas.  It may be served with process by and through its registered agent Gregory E. Lichtwardt, 331 E. Evelyn Ave., Mountain View, California, 94041.

## III.
## JURISDICTION AND VENUE

7. This is a civil action over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(3) and (4).  The case involves the resolution of federal questions regarding the deprivation of Plaintiff's federal rights to be free from unlawful retaliation for engaging in protected activity.

8.      Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391(b) since a substantial part of the events or omissions giving rise to this cause of action occurred in the Southern District of Texas.

## IV.
## FACTS

9.      James worked as salesmen for Defendant Conceptus, a company which manufactures a female contraceptive medical device known as Essure®.

10.     In or around August 2010, Plaintiff took over several accounts of another Concetpus salesman named Chris Orlaska. These accounts included certain doctors' offices. Shortly thereafter, James began noting discrepancies in some of the physician's inventory of Essure® kits and related medical equipment. Specifically, James found information which caused him to believe that Orlaska was unlawfully selling at a reduced cost or giving Essure® kits to these physicians, and that certain physicians may have been complicit in the scheme or unlawfully induced to use the kits. James further believed that certain physicians may have been illegally billing Medicaid for these kits when they were either being given to the physician for free or at a reduced rate.

11.     On or about August 16, 2010, during a sales call, James spoke with a nurse of one of the doctor's offices who stated that she needed no additional kits because Orlaska had the day before just made the office a "great deal" on ten (10) Essure® kits and a hysteroscope.

12. According to the nurse, Orlaska further stated that he had obtained the inventory from a retiring eighty-two (82) year-old doctor. James was then permitted by the nurse to see the subject kits. He asked to speak with the physician, but was told he was not in the office at the time. After the meeting, he checked his daily and monthly sales reports which reflected no sale of kits by Orlaska to this physician.

13. The concerns raised by this meeting and the records were, as stated above, that Orlaska was selling at reduced rates or giving away Conceptus property (kits and/or equipment) as an unlawful inducement, and also that certain physicians may be defrauding the federal government by seeking full reimbursement from Medicaid for kits and/or equipment which they had been given at a lower or no cost.

14. James brought these concerns to his manager, Derek Zeimer's, attention the same day as his visit to the physician's office; however, to his knowledge, nothing was being done to investigate them. Zeimer would say, "I'll get back to you," but he did not. As a result, on or about October 14, 2010, James brought the complaints to Zeimer's boss, Ric Cote, then Executive Vice President of Sales. Cote told James he knew nothing of the situation. He said he would "look into it" and get back to James.

15. The next day, Pete Essex, the new Vice President of Sales who reported to Cote (and Zeimer's new boss), called James to discuss the issues. During the call, Essex said "...be very careful about making these allegations because someone could go to jail." Essex also said something to the effect that James did not get along with Orlaska that well, and wondered whether the complaints related to that fact. James denied any bad blood with Orlaska and said his complaints were made in good faith and because of what he saw and heard. James relayed to Essex the concerns about Orlaska's conduct and the exposure to the company as a result of the Medicaid billing issue. James remained firm in his position that an investigation should ensue as it related to Orlaska, the physicians, and the company's involvement and potential for liability.

16. At the end of the call, Essex told James that if he wanted to pursue the matter he should email his complaint to Dorothy Garofalo, Director of Human Resources, and that he did not need to copy anyone on the email. Accordingly, during the evening on Friday, October 15, 2010, James composed and sent an email containing his complaints to Garofalo.

17. In the email, James stated that:

> "Orlaska has unlawfully used Conceptus property (i.e. equipment and Essure kits) for personal gain into his former accounts and in doing so has put our company in a very exposed position particularly in the area of the physicians who are buying these products and billing the federal government."

5

18.     The following Monday, October 18, 2010, James was contacted by Zeimer who ordered him to forward a copy of the email to him, which James did. Zeimer then discussed his strategy whereby James needed to "investigate the fraud allegations" by visiting one of the subject physicians to gather information related to the inventory, including the required kit lot numbers. James did as he was told and visited the office of Dr. Steven D. Metzler.

19.     James arrived at the doctor's office the same day. He approached the sliding-glass window, leaned in, and discussed with the office manager what he needed. However, Dr. Metzler's office refused to provide James with access to any of the requested information. Per his manager's instructions, James stated that "[t]here may be stolen kits floating around the medical center, and I just want to make sure you do not have any." The office manager spoke with Dr. Metzler and again refused James the requested access.

20.     James told the office manager that, per his manager's instructions, a subpoena may be issued for the needed data. She said she understood and James left the office. The following day, the office manager called James to confirm the nature of the request and inquire as to what exactly was needed. The conversation was very cordial. At the end, James provided the office manager with Zeimer's name and contact information. James updated Zeimer regarding the visit via email later that same day.

21. On October 20, 2010, Garofalo left James a voice message wherein she stated that she received his formal complaint, and that he should not have any further contact with Orlaska. She made no mention of needing additional details from James regarding the alleged illegal acts, nor what she intended to do to investigate the issues.

22. The next contact of any kind came on October 26, 2010, when Garofalo called James to say that Dr. Metzler had written a complaint letter to Conceptus CEO, Mark Sieczkarek. Garofalo did not share the letter nor read its contents to James, but she did say that James was alleged to have acted inappropriately. James denied acting inappropriately and shared a brief overview of the cordial and well-mannered visit, stated that it was sanctioned by Zeimer as part of the investigation into James' complaints of illegal acts, that he had sent a brief update email to Zeimer after the visit, and that the office manager even followed-up the next day in a nice and pleasant manner.

23. During that call, Garofalo did not question James regarding the formal complaints which he initiated nearly two (2) weeks earlier. She also did not ask James for any formal or written statement of events as they related to the visit to Dr. Metzler.

24. Garofalo did not tell James that he would be disciplined, she did not say his job was in jeopardy, nor did she advise him of any company policy regarding these issues.

25. Later that day, and without any explanation, Zeimer called James and stated that he needed to meet with him at the Marriott hotel lobby at Bush Intercontinental Airport in Houston at 1 p.m. the following day. On October 27, 2010, James arrived at the location whereupon he was met by Zeimer, as well as Garofalo. Garofalo said that, per her call with him the day before, James' employment was being terminated. Garofalo did not at any time during this meeting share with James the letter from Dr. Metzler, nor ask him to respond to any of the specific allegations. Additionally, neither she nor Zeimer inquired further into James' complaints of illegal activity. James would not have been fired when he was but for his complaints of illegal activity as protected under the Act.

26. However, following his termination, and as further retaliation against him, James received a threatening letter from a lawyer hired by Conceptus. The letter accused James of different types of allegedly illegal conduct. James was forced to hire an attorney to respond to the false allegations. Eventually, Conceptus recognized that it possessed no basis for making the frivolous allegations against James, and the matter was dropped.

27. It is clear that Conceptus was trying to squelch and discredit James for having made the complaint of illegal activity, and to ensure that if the complaints ever saw the light of day via a real investigation conducted by a

federal agency, the complainant would be sufficiently sullied that his word would be tarnished.  The plan backfired on Conceptus.

## V.
## CAUSES OF ACTION

28. Conceptus has violated the False Claims Act, 31 U.S.C. § 3730(h), in that James had knowledge of fraud and came forward with it.  James engaged in acts "...in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." § 3730(h).  James characterized his concerns as involving illegal, unlawful, or false-claims investigations.

29. James will show that he engaged in activity protected under the statute, that Conceptus knew he engaged in protected activity, and that his discharge was motivated by it.

30. Conceptus is liable to James for all damages afforded him under the statute, including back pay, liquidated damages, emotional damages, attorney's fees, costs, and all other damages necessary to make James whole.

## VI.
## JURY DEMAND

31. James requests a trial by jury.

## VII.
## RELIEF REQUESTED

32. James seeks the following damages as a result of the actions and/or omissions of Conceptus described herein above:

    a.    Reinstatement with the same seniority status that he would have had but for the discrimination (or front pay in lieu thereof);

    b.    Two (2) times the amount of back pay;

    c.    Interest on the back pay and front pay;

    d.    Compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and,

    e.    All other relief necessary to make him whole.

Respectfully submitted,

**SHELLIST LAZARZ SLOBIN LLP**

By: */s/ Martin A. Shellist*
Martin A. Shellist
State Bar No. 00786487
Fed. I.D. 16456
3D International Tower
1900 West Loop South, Suite 1910
Houston, Texas  77027
Telephone:  (713) 621-2277
Telecopier:  (713) 621-0993

**ATTORNEYS FOR PLAINTIFF TOBY JAMES**